# United States Court of Appeals for the Federal Circuit

---

**HERITAGE ALLIANCE, AFA ACTION, INC.,**
*Appellants*

**v.**

**THE AMERICAN POLICY ROUNDTABLE,**
*Appellee*

---

2024-1155

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91249712.

---

Decided: April 9, 2025

---

JOSHUA JONES, Dickinson Wright PLLC, Austin, TX, argued for appellants.

ROBERT J. BASIL, The Basil Law Group, PC, New York, NY, argued for appellee. Also represented by DANIEL JOSEPH SCHLUE, Schlue Intellectual Property Law, Massillon, OH.

---

Before PROST, TARANTO, and STARK, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Heritage Alliance offers voter guides to the public under the names "iVoterGuide" and "iVoterGuide.com." In January 2019, the American Policy Roundtable (APR), whose website offers information on public policy and political issues to the public, filed for registration of the marks "iVoters" and "iVoters.com." Heritage (which was eventually joined by AFA Action, Inc.) opposed APR's registration on the ground that APR's proposed marks would likely be confused with Heritage's marks, for which Heritage claimed priority of use as marks. *See* 15 U.S.C. § 1052(d) (providing for refusal of registration on such grounds). The Trademark Trial and Appeal Board (Board) of the United States Patent and Trademark Office (PTO), noting that likelihood of confusion was effectively conceded by APR, found that Heritage's prior-use marks were not themselves protectable, reasoning that Heritage's "iVoterGuide" and "iVoterGuide.com" marks were highly descriptive and had not acquired distinctiveness, and the Board therefore dismissed the opposition. *Heritage Alliance v. American Policy Roundtable*, Opposition No. 91249712, 2023 WL 6442587, at *1, *9, *13 (Sept. 29, 2023) (*Board Decision*). Heritage appeals. We affirm the dismissal.

I

Since sometime during the 2008 election season, Heritage has been publishing online voter guides under the names "iVoterGuide" and "iVoterGuide.com" (collectively, iVoterGuide marks). The iVoterGuide marks are common-law marks. Although in 2016 Heritage registered a similar mark with the PTO, the registration was subsequently cancelled for failure to file maintenance documents under 15 U.S.C. § 1058(a). *See Board Decision*, at *1 n.4. The Board, in its rulings on the issues now before us, relied only on the common-law mark, not the cancelled Heritage registration. *Id.* at *1–2; *cf. id.* at *3 (discussing filings made involving Heritage's registration as one ground for finding that

Heritage was entitled to launch the present opposition, an issue not presented on appeal).

APR began publishing campaign and political information on its website well after Heritage's launch: APR alleged a June 2010 start date, but the Board found that APR had no evidence of use before 2019. *Id.* at *4. On January 22, 2019, APR filed applications to register the marks "iVoters" (Serial No. 88271491) and "iVoters.com" (Serial No. 88271486) (collectively, iVoters marks), identifying the services for which the marks were sought to be registered as "[p]roviding a web site of information on current public policy issues, political campaigns and citizen concerns related to political issues." J.A. 31, 51. On May 21, 2019, after the PTO examiner approved the marks for publication, APR's iVoters marks were published in the Trademark Official Gazette, J.A. 48, 68; *see* 15 U.S.C. § 1062(a), initiating a 30-day period (subject to extension) during which a party believing it would be harmed by the registration of the mark at issue may file an opposition to the registration, *see* 15 U.S.C. § 1063(a) (establishing opposition right for a person that "believes that [it] would be damaged by the registration of a mark").

On July 19, 2019, after receiving an extension of time, Heritage timely filed with the PTO a notice of opposition to registration of APR's iVoter marks, asserting that it would suffer the damage identified by § 1063 and that registration should be denied under 15 U.S.C. § 1052(d) because APR's iVoter marks would likely be confused with Heritage's iVoterGuide marks, which had priority. J.A. 71–76; *see* 15 U.S.C. § 1052(d) (providing for refusal of registration of a mark if it "so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive"). Heritage later assigned the iVoterGuide marks to AFA, and on June 16, 2022, AFA was joined as a plaintiff to the opposition proceeding. J.A. 410.

We hereafter refer to Heritage and AFA collectively as "Heritage."[1]

On September 29, 2023, the Board dismissed Heritage's opposition. *Board Decision*, at \*1. The Board determined that Heritage had begun using its iVoterGuide marks well before APR's first use date (January 22, 2019, APR's registration filing date). *Id.* at \*3–6. And the Board, though not ruling on likelihood of confusion, found that APR "effectively concede[d] likelihood of confusion by not addressing that issue in its brief." *Id.* at \*13. The Board nonetheless ruled that Heritage's prior-use marks could not support its challenge because the marks were not themselves protectable as trademarks (before APR's first-use date), so they lacked cognizable priority. *Id.* at \*13, *see Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1321 (CCPA 1981) ("[E]ven though something is used as a trademark, if it is not distinctive, the user does not have a trademark because he has no existing trademark rights." (emphasis omitted)). The Board reasoned that Heritage had to "prove by a preponderance of the evidence that [its]

---

[1]    Heritage and APR sued each other in district court regarding their respective iVoterGuide and iVoters marks and websites, but those disputes have been resolved. *See Heritage Alliance v. American Policy Roundtable*, Case No. 1:18-cv-00939 (W.D. Tex. 2018) (Heritage's suit against APR, which was dismissed with prejudice on June 22, 2021, ECF No. 80); *American Policy Roundtable v. Heritage Alliance*, Case No. 1:19-cv-00535 (N.D. Ohio 2019) (APR's suit against Heritage, which was transferred to the Western District of Texas on September 12, 2019, ECF No. 35); *American Policy Roundtable v. Heritage Alliance*, Case No. 1:19-cv-00906 (W.D. Tex. 2019) (APR's suit against Heritage upon transfer, which was dismissed with prejudice on July 7, 2022, ECF No. 50). The Board did not, and the parties do not, rely on that litigation in the present appeal.

pleaded marks are distinctive, inherently or otherwise," *Board Decision*, at \*5; *see also id.* at \*6, but Heritage had failed to do so, *id.* at \*6–13.

The Board proceeded in two steps in its analysis of the iVoterGuide marks' distinctiveness. First, the Board found that the marks were not just descriptive but "highly descriptive," as the entire mark clearly described the entire service offered: providing a voter guide on the Internet. *See id.* at \*7–9. The Board determined that "i" stood for Internet, "VoterGuide" was descriptive of the service, ".com" had "no source-identifying significance," and the combination did not convey "any distinctive source-identifying impression." *Id.* at \*8–9. Second, the Board found that Heritage's marks had not acquired distinctiveness. *Id.* at \*10–12. The Board reviewed Heritage's proffered evidence on that issue—in particular, the length of time Heritage had used the mark and declarations from three of Heritage's volunteers—but found the evidence insufficient to show acquired distinctiveness. *See id.* at \*10–12.

Heritage timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a)(1).

## II

In reviewing the Board's decision, we decide any legal issues de novo, and we review the Board's factual findings for substantial-evidence support. *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1364–65 (Fed. Cir. 2018). Substantial evidence requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. National Labor Relations Board*, 305 U.S. 197, 229 (1938). Heritage, as the opposer, had the burden of proving the facts necessary to its challenge, *Eastman Kodak Co. v. Bell & Howell Document Management Products Co.*, 994 F.2d 1569, 1575 (Fed. Cir. 1993), which here are the facts of inherent or acquired distinctiveness of its iVoterGuide marks, *see Otto Roth & Co.*, 640 F.2d at 1321.

Heritage challenges the Board's findings that its marks were not inherently distinctive because they were highly descriptive and that they had not acquired distinctiveness (secondary meaning) by APR's filing date. We reject both challenges.

A

Heritage first contends that the Board erred in finding that the iVoterGuide marks are descriptive, indeed highly descriptive. It argues that the Board's determination did not rely on sufficient evidence in the analysis of the prefix "i," and that the Board erred in analyzing the individual components of the asserted marks instead of the marks as a whole. We are not persuaded.

A term is "merely descriptive if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Chamber of Commerce of the United States*, 675 F.3d 1297, 1300 (Fed. Cir. 2012) (quoting *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963 (Fed. Cir. 2007)); *see also In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004) (citing *Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 543 (1920)). The category of descriptive terms "is not a monolithic" one: "Some terms are only *slightly* descriptive and . . . [o]ther terms are *highly* descriptive." *Real Foods Pty Ltd. v. Frito-Lay North America, Inc.*, 906 F.3d 965, 972 (Fed. Cir. 2018) (quoting 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 11:25 (5th ed. 2018)). Whether a mark is descriptive is a question of fact, *Royal Crown*, 892 F.3d at 1364, as is whether a mark is highly descriptive, *Real Foods*, 906 F.3d at 972 ("Placement of a term on the fanciful-suggestive-descriptive-generic continuum is a question of fact." (quoting *DuoProSS Meditech Corp. v. Inviro Medical Devices, Ltd.*, 695 F.3d 1247, 1252 (Fed. Cir. 2012))). The degree of descriptiveness of a term, including whether the term is "highly descriptive," is relevant to whether the term has "acquired

distinctiveness," because acquired distinctiveness is more difficult to establish for a highly descriptive term. *Royal Crown*, 892 F.3d at 1368–69; *In re Louisiana Fish Fry Products, Ltd.*, 797 F.3d 1332, 1336 (Fed. Cir. 2015); *In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005); *In re Bongrain International (American) Corp.*, 894 F.2d 1316, 1317 n.4 (Fed. Cir. 1990).

Even when the parts of a mark individually "are merely descriptive" of the product, the Board must "determine whether the mark as a whole, i.e., the combination of the individual parts, conveys any distinctive source-identifying impression contrary to the descriptiveness of the individual parts." *Oppedahl & Larson*, 373 F.3d at 1174–75 (citing *In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985)). But consideration of a mark in its entirety "does not preclude consideration of components of a mark; it merely requires heeding the common-sense fact that the message of a whole phrase may well not be adequately captured by a dissection and recombination." *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340–41 (Fed. Cir. 2015). Thus, in evaluating an asserted mark's descriptiveness, "the Board may weigh the individual components of the mark to determine the overall impression or the descriptiveness of the mark and its various components." *Oppedahl & Larson*, 373 F.3d at 1174 (citing *National Data Corp.*, 753 F.2d at 1058). And "[e]vidence that a term is merely descriptive to the relevant purchasing public 'may be obtained from any competent source, such as dictionaries, newspapers, or surveys.'" *Bayer Aktiengesellschaft*, 488 F.3d at 964 (quoting *In re Bed & Breakfast Registry*, 791 F.2d 157, 160 (Fed. Cir. 1986)).

The Board's finding in this case that the iVoterGuide marks are not just descriptive but highly descriptive is supported by substantial evidence. As to the components: The Board had, and cited, substantial-evidence support for its determination that the prefix "i" generally refers to something Internet-based. *Board Decision*, at *9 (citing J.A.

263–64 ¶ 8 (declaration of Heritage President and AFA Vice President Ms. Debbie Wuthnow); J.A. 291 (deposition of Heritage founder Mr. Richard Ford); J.A. 75 ¶ 4 (Heritage's notice of opposition); and J.A. 426 (Heritage's brief in this opposition)).  Board decisions have recognized that "i" can have that meaning.  *See, e.g.*, *In re Zanova, Inc.*, 2001 WL 460111, at *6 (T.T.A.B. 2001) (finding that the "I" in "ITOOL" means Internet); *RxD Media, LLC v. IP Application Development LLC*, 2018 WL 1027859, at *13 (T.T.A.B. 2018) (finding the "I" prefix means "Internet-enabled or accessible").  Heritage did not provide meaningful evidence of alternative interpretations of the "i" of its asserted marks.  *See* Oral Arg. at 2:15–25, available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=24-1155_0303202 5.mp3.  The Board also found that "VoterGuide" and ".com" were not distinctive, *Board Decision*, at *9, and Heritage does not even challenge those (facially reasonable) findings on appeal, much less demonstrate error in them.

Contrary to Heritage's assertion, the Board did consider the marks as a whole in its descriptiveness analysis.  *Id.* at *9.  It determined that the proposed marks "on their face refer to online voter guides" and no evidence demonstrated that the combination of the individual components of the asserted marks conveyed "any distinctive source-identifying impression contrary to the descriptiveness of the individual parts."  *Id.* (quoting *In re Fat Boy Water Sports LLC*, 2016 WL 3915986, at *6 (T.T.A.B. 2016) (quoting *Oppedahl & Larson*, 373 F.3d at 1175)).  Heritage has not pointed to any evidence making that finding unreasonable.  The same is true for the Board's further finding that Heritage's marks were, in fact, "highly descriptive."  *Id.* Beyond conveying a characteristic of the product or service, the "iVoterGuide" marks are such that the whole of the marks directly and immediately conveys the whole of the product—provision of a voter guide on the Internet.  That property suffices for the marks to be highly descriptive.  *Cf. Real Foods*, 906 F.3d at 973–77 (affirming findings that the

marks "corn thins" and "rice thins" were highly descriptive of their associated products); *see also In re Hikari Sales USA, Inc.*, 2019 WL 1453259, at *17 (T.T.A.B. 2019) ("In this case, we find that the designation 'Algae Wafers' is highly descriptive of fish food. The record establishes that the wording directly and immediately identifies significant features of the goods without requiring thought or imagination to discern the nature of the goods."). We thus see no reason to disturb the Board's finding that the iVoterGuide marks are highly descriptive.

## B

Heritage argues that even if the iVoterGuide marks are descriptive or highly descriptive, the Board erred in finding against Heritage on the issue of acquired distinctiveness of its iVoterGuide marks. Heritage asserts that two aspects of the record require a finding of acquired distinctiveness: (a) the undisputed evidence that it continuously used the iVoterGuide marks for more than five years before the 2019 date the Board used for APR's first use, Heritage Opening Br. at 14–15 (citing 15 U.S.C. § 1052(f)); *see Board Decision*, at *6, *11, and (b) declarations from three of Heritage's panelists (*i.e.*, volunteers who helped make Heritage's voter guides) from around 2008 that they associated the marks with Heritage, *id.* at 16–17. We disagree.

Acquired distinctiveness is a fact that must be determined on the entire record, *Yamaha International Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988), and establishing that property is harder when the term at issue is highly descriptive (as the Board found in this case) than when it is descriptive to a lesser degree, *Royal Crown*, 892 F.3d at 1369. Direct and circumstantial evidence may be considered, and we have approved analyzing the issue by considering six factors, without deeming all factors always relevant or the list exhaustive:

(1) association of the trade dress with a particular source by actual purchasers (typically measured by consumer surveys);

(2) length, degree, and exclusivity of use;

(3) amount and manner of advertising;

(4) amount of sales and number of customers;

(5) intentional copying; and

(6) unsolicited media coverage of the product embodying the mark.

*Converse, Inc. v. International Trade Commission*, 909 F.3d 1110, 1120 (Fed. Cir. 2018).  The Board viewed Heritage as invoking only the first two factors, noting that no evidence was presented to address the other factors.  *Board Decision*, at *11.

Heritage argues that the Board should have accepted its five-plus years of prior continuous use as "prima facie evidence" that the marks had acquired distinctiveness" Heritage Opening Br. at 15, relying on 15 U.S.C. § 1052(f) in support.  The relied-on provision, however, states only that if there is "proof of substantially exclusive and continuous use [of a mark] . . . for the five years before the date on which the claim of distinctiveness is made," the Board "*may* accept" such proof "as prima facie evidence that the mark has become distinctive."  15 U.S.C. § 1052(f) (emphasis added).  That language indicates that the Board has discretion not to accept such evidence as prima facie evidence, much less as ultimately persuasive evidence, on a case-by-case basis.  Our case law similarly recognizes the Board's discretion to weigh the evidence, especially for a highly descriptive mark.  *See Yamaha*, 840 F.2d at 1581 (explaining that the "exact kind and amount of evidence" needed to show distinctiveness "necessarily depends on the circumstances of the particular case" (citations omitted)); *Louisiana Fish Fry Products*, 797 F.3d at 1337 (holding that for

a highly descriptive mark, the Board was "within its discretion not to accept . . . alleged five years of substantially exclusive and continuous use as *prima facie* evidence of acquired distinctiveness"). In the circumstances of this case, we see no unreasonableness in the Board's declining to rely on Heritage's five-year-prior-use evidence given the highly descriptive nature of Heritage's marks and the limited additional evidence of acquired distinctiveness. *Board Decision*, at *11.

The limited additional evidence consisted of declarations of three individuals described by Heritage as "end customers" of their services. Heritage Opening Br. at 16 (citing J.A. 322–24 (declarations); J.A. 274 (same)). We see no error in the Board's giving little weight to that evidence. *Board Decision*, at *12. Declarations may be given little weight if they are "conclusorily worded," fail to explain what makes a product "distinctive from those of its competitors," or come from individuals who "at most purport to represent the views of a small segment of the relevant market." *In re Pacer Technology*, 338 F.3d 1348, 1353 (Fed. Cir. 2003). Here, the Board had ample reason to give the declarations little weight on the relevant question. As the Board accurately said, the declarations were "all essentially identical in form" and came from declarants who "were not random consumers but were volunteers used by [Heritage] to 'help evaluate candidates so they could be graded regarding their positions on the issues.'" *Board Decision*, at *12 (citations omitted). The declarations provide no explanation for the asserted belief that the marks were distinctive, and all they assert is that the three declarants themselves—who were volunteers for Heritage—"associated IVOTERGUIDE with Heritage Alliance and its providing of a website that provided information about candidates running for office." J.A. 322–24. Moreover, the Board noted, and Heritage does not dispute, that there was no record evidence of the size and nature of the customer base that would allow an inference that the declarations

"meaningfully reflect consumer perception of [Heritage's] purported marks in the marketplace." *Board Decision*, at *12. We conclude that the Board's determination that the marks had not acquired distinctiveness by January 2019 is supported by substantial evidence.

\* \* \*

For the foregoing reasons, we affirm the Board's determinations that Heritage's marks are highly descriptive and had not acquired distinctiveness as of January 22, 2019, and we affirm the dismissal of the opposition. The Board's ruling and ours raise an obvious issue: Do those rulings provide a reason for the PTO now to reconsider whether it should refuse registration to APR's iVoters marks—as to which the Board found APR "effectively concede[d] likelihood of confusion" with Heritage's marks, *Board Decision* at *13? *See* 15 U.S.C. § 1052(e) (providing for refusal of registration of a mark "when used on or in connection with the goods of the applicant is merely descriptive . . . of [the goods]"). The opposition provision of the Lanham Act says that registration generally follows when an opposition, if any, fails, but the stated precondition is that the mark at issue be a "mark entitled to registration," 15 U.S.C. § 1063(b), which might allow the PTO, after an opposition fails, to reconsider the examiner's pre-opposition allowance. Also, if a person believes it "will be damaged . . . by the registration of a mark," it may seek cancellation of the registration. 15 U.S.C. § 1064. Neither a PTO reconsideration nor a cancellation is before us, so we do not decide any issues concerning such processes.

## III

The decision of the Board is affirmed.

## **AFFIRMED**